Case No. 13-5268 et al. Swanson Group Mfg. LLC et al. v. Sally Jewell, Secretary of the Interior et al. Claimant, Siskiyou Wildlands Center et al. Appellants. Mr. Toth for the appellants, Mr. Rudzik for the appellees. Good morning, Your Honors. Brian Toth from the Department of Justice, representing the Secretaries of the Interior and the Secretary of Agriculture. With me at council table is Kristen Boyles, representing the intervener appellants. I'm going to attempt to reserve a few minutes of my time for rebuttal. For the past 20 years, the Oregon and California Lands Act has been at the heart of challenges brought by timber industry organizations. The Secretary of the Interior's management of lands within the range of the Northern Spotted Owl and the Pacific Northwest. But until this case, no district court has taken the extraordinary step of granting the equivalent of a writ of mandamus, compelling the Secretary to sell a set quantity of timber each year without exception in perpetuity. In taking that extraordinary step, the district court also enjoined and set aside the very methodology that the Secretary uses in consulting with the Fish and Wildlife Service on effects to the Northern Spotted Owl. And that is a process that is necessary to sell the timber that the Secretary was compelled by the court's order to sell. That neatly illustrates the dilemma that the Secretary faces in managing these lands, both for timber production and for her responsibilities to comply with environmental statutes like the National Environmental Policy Act and the Endangered Species Act. At the outset, there are some problems of justiciability in this case. The plaintiffs have not adequately demonstrated their standing with specific facts to satisfy Article III of the Summer Judgment Stage, nor are their challenges to the owl claims ripe for judicial review under the principles of AVID Labs. We rest on the arguments in our brief on those topics, and although I'm happy to answer any questions about those topics, I'd like to focus the presentation this morning on two other fundamental errors in the district court's order. First, the claim seeking the equivalent of mandamus to compel the sale of timber does not satisfy the two essential requirements that the Supreme Court articulated in the Southern Utah case. And second, as to the owl methodology, it has no direct legal consequences for any regulated entity, including timber sale purchasers, nor does it alter the legal regime to which the agencies are subject and is therefore neither final agency action nor a legislative rule, requiring notice of comment. Starting with the 706.1 claim, under the principles of Southern Utah, in order to make a 706.1 claim viable, the statute has to support both a duty that is a specific unequivocal command, and it also has to result in a compelled relief that is discrete rather than programmatic. The Lands Act's volume provision here satisfies neither of those two requirements. Starting with the first requirement, that there must be a specific unequivocal command in the case of the statute, this goes back to what the Supreme Court said is the codification of traditional mandamus practice, which held that only nondiscretionary duties, ministerial duties, if you will, were enforceable through its mandamus. Although the Lands Act contains the mandatory shall language, the clause that follows, the comma in that provision, only requires the Secretary of the Interior to sell as much timber as can be sold at reasonable prices on a normal market. And everything in that clause provides a capaciousness that defeats any claim that there's a specific and unequivocal duty. Unequivocal is, after all, the synonym for ambiguous, and if there's any room and ambiguity in the phrasing, particularly for the Secretary of the Interior to interpret that phrasing, then that necessarily defeats a claim for the equivalent of mandamus. So, as I understand it, you're not arguing that the Secretary has no duty under the statute, but simply that the way the Secretary carries out her duty is not subject to mandamus. And I understood the plaintiffs to be arguing that that may well be so, but at the point the Secretary has taken all of these steps and come up with a number, then there is a mandatory duty to make that amount of timber available for sale. So at that point, the mandatory duty kicks in. As I understand, at least part of the plaintiff's argument. That may be their argument. That's not how the statute ought to work. But what do you think this statute is all about? So it does provide a responsibility for the Secretary of the Interior to declare a sustained yield figure, which the Secretary has done. Then the Secretary is to sell as much of that figure as can be sold at reasonable prices on a normal market. Just so I understand, the sustained yield capacity that the Secretary has actually done something called sustained yield capacity? This gets confusing because there are different terms that the Secretary interprets as referring to the same quantity, which, yes. The statute, too, refers to both productive capacity and sustained yield capacity. For our purposes, we take those two to be the same. The additional confusion is that in the land use plans, the term allowable sale quantity is used. That is meant to capture the sustained yield figure. It hasn't always been called that. It used to be called the allowable cut, but the terminology since the Northwest Forest Plan has been allowable sale quantity. What's the reason why the amount specified in the finding was not sold? Throughout the record, there is support for the conclusion that court orders injunctions against timber sales, where the Secretary has attempted to offer timber for sale or has developed an environmental document and a decision to award timber but has been sued primarily by environmental groups. The Secretary has been unable to offer that volume. Sometimes offer that volume at offer sale, and sometimes it's been offered and accepted by a purchaser, but then the sale is enjoined. So, but for the injunctions that were in effect, the Secretary would have sold the amount that, what was it, 47 million word feet and 52 million or 50-some? Fifty-seven. Fifty-seven. It's only the injunctions that prevented the Secretary from selling that amount? I can't say that for sure. In addition, there's an overlay of environmental statutes and procedures apart from the court orders. The court orders are enforcing requirements of these environmental laws like the Endangered Species Act, National Environmental Policy Act that were enacted after the Lands Act but still impose a layer of procedural and substantive requirements in some cases that the Secretary has to comply with. Take the Endangered Species Act. I thought that when you came up with that number, say 45 million word feet for the Roseburg District, that that number takes into account the protection of the spot event. Is that correct? It did in 1995. Since that time, there has been new information. There has been, well, that figure anticipated that timber would be awarded at a certain level, and it's just never happened. I don't think there's any dispute that it's never happened, and largely that's as a result of environmental litigation. It's also a result, for example, some of the plan requirements have been interpreted to require the agency to go out and survey timber sales sites for certain non-endangered, non-threatened species before they conduct timber sales to make sure those species are not present in the sales. That's very time-consuming, very resource-intensive, and that is something that occasionally gets litigated, and the agency has tried to remedy it over time, but those attempts to amend the plan to remove those requirements have also been challenged and set aside. That number, the 45 million word feet, 57 million word feet, seems very large, but in fact it's just a tiny, tiny fraction of all the timber that's harvested in Oregon alone, isn't it? It's lower than the historic figure that has been declared before the listing of the Northern Spot. I'm talking about across the entire state of Oregon. He's not just talking about Forest Service. That I do not know, Your Honor. I've read a figure that says the total harvest per year in Oregon is something in the neighborhood of 2 to 4 billion word feet, and if that's true, this number is just, I don't know what the percentage is, but it's probably less than 1%. Well, I don't think anybody anticipated when these land use plans were adopted 20 years ago now that the level of timber that they had set in that declared quantity would not be able to be met in the way that it hasn't been met since that time. There have been attempts. I mean, one of the features of the plan that I mentioned, the survey requirements, the Secretary has attempted to remove because they pose a workability problem in getting timber sales planned and approved, and it's, again, these administrative decisions to attempt to address this issue have been stopped by courts, decisions set aside, and there has been no administrative fix to this. Congress, of course, has been aware of this for 20 years, that the timber sale levels have been dramatically lower than were anticipated in the plan, and there's been no action from Congress apart from authorizing what was the secure rural schools funding as an alternative to the money that was supposed to be generated as a result of timber receipts. So isn't that statute an indication of Congress's understanding that the ONC Act does not actually compel the cutting of the amount of sustainable yield? Yeah, I believe that's right. Well, I wonder why you didn't make that argument. Well, I mean, the secure rural schools bill is mentioned throughout the record, but, yeah, it would be an argument that by congressional non-action that that indicated congressional intent. Well, it's not just a non-action. The purpose of that act was to recognize the fact that the environmental lawsuits were limiting the ability to sell, and there had to be an additional subsidy to make up for that. Right. No, that's accurate. And that just further demonstrates that Congress has understood that this law, as it interacts with the Endangered Species Act and the National Environmental Policy Act, has to provide some discretion for the Secretary to plan timber sales in accordance with all those other laws in attempting to meet this volume figure. I don't see how – I understand that argument. I think it's a better argument than your argument based on southern Utah. I really don't see how you think this case is anywhere close to the statute and land-use planning that they were talking about in southern Utah. That was a statute that said, continue to manage in a manner so as not to impair the suitability of such areas for preservation as wilderness. That is not quite the same as saying you shall sell X amount of board feet at reasonable prices on a normal market. And that seems like an enormous stretch of the Supreme Court's opinion. Well, I think our arguments are based on the same first principles in that case, namely that there has to be a specific unequivocal command. But in that case, this was not – the problem was an extremely broad and vague set of commands. You don't actually think that this case is on fours with the Supreme Court's opinion in that case, do you? It's not the same statute. I agree that this is a different statute, and it makes it in a lot of ways a harder case to apply the principles of southern Utah. But I think the principles still counsel in favor of denying their 706-1 claim here. The other aspect of southern Utah is the programmatic nature of the relief that's compelled. Here, it's a volume that's at the sum of the agency's entire program. But it's not really. In that case, they were asking for programmatic relief in the classic sense. In this case, they're just selling, sell X amount of board feet, period. In other words, the judge is saying, I don't care how you do it. Just sell it. That's pretty discreet. It may be wrong. I take your argument. That is your argument. But it's not programmatic. It's not saying get into the details of off-road, get into the details of all the other things that were at issue in that case. Here, it's just one flat order by a district judge. It's programmatic in the sense that it compels a result that is the course of the agency's administration of the whole timber program on these lands in an entire year. And to play this out, I mean, the problem comes in judicial management of compliance with this type of court. Well, the judge doesn't have to – in the judge's view, he doesn't have to manage anything. You do whatever you want. If you don't sell this amount, you'll go to jail for contempt. That's the whole thing, not you personally. No, but there are problems of impossibility. Just the secretary. Both secretaries, I assume. There are problems in that sense of impossibility of performance and of substantial compliance that the district court would have to look at if – Not under his view. He's just ordered you to do it, period. In his view, the statute requires you to sell this amount. There's no ifs, ands, or buts. There's no exceptions in his order. That's it. Now, there may be something wrong with that kind of order, but the problem with that order is not that it gets into the program. Quite the opposite. His whole point is to avoid any involvement in the internal affairs, sell this amount, or you go to jail. It doesn't get into the details of managing the discretion of individual timber sales. That's true. But the Supreme Court rejected that type of approach. In southern Utah, the argument was made that you can just simply compel a discreet result and leave it to the agency to manage the discretion to get to that result, and the Supreme Court said that only refers to a discreet – at the end of the day, a discreet action. And here, where you're talking about managing compliance in the way of examining the sum of the agency's entire program administered throughout the year, I just think that's completely unmanageable. Can you say a few words about the AL methodology, your argument there? I'm not sure I follow your argument on that. So, yes. So the methodology is a scientific tool that the Secretary of the Interior uses. And when I say the Secretary, this is a staff-level paper that was developed by biologists from three different agencies, Fish and Wildlife Service, Forest Service, and Bureau of Land Management, to arrive at a solution to a court's decision, the Ninth Circus decision, on quantifying incidental take as a result of these types of timber sale projects. And the methodology provides a way to numerically estimate the incidental take that might occur from various timber sales. The methodology by itself, however, doesn't impose any requirements on timber sale purchases in the abstract. It is only through application in a particular case, in a biological opinion, for example, that it would impose any obligations whatsoever. And what it does there is it enables the Fish and Wildlife Service to estimate numerical take of owls. And that allows the timber sale to go forward without the risk of incurring liability for a prohibited take under the Endangered Species Act. The dots where the computer model generates as possible owl habitat, and then the area around them, they can't harvest timber in those spots? Is that what happened? It's not necessarily the case. So the Endangered Species Act requires the use of the best available science. That's the statutory standard. And this was a tool that they developed to say where there are no surveys, where you haven't actually gone out, checked the landscape to see whether there are owls present, and this may be the best available information. And it's a model that's created from a lot of assumptions about what habitat the owl likes, what the nearest distance to the next nearest nest that you know about would be. And then within that, they can randomly generate locations where the owl might be. Here's a question I have. It looks to me, if I look at it, and then I look at the definition in the APA, it looks like a rule. And it also appears to be final. The fact that it may change doesn't make it any less final. All rules can be changed. The question then becomes, is it exempt from rulemaking as an interpretive rule or an agency policy or an agency procedure, which are exempt from rulemaking? And I'm not really finding in your brief a clear answer to what it is. Is it an interpretive rule? Is it an agency policy? Or is it an agency procedure? It's most like a statement of policy in that it's not intended to be and it's not intended to have the force and effect of law like a legislative rule would. You know, if you've already reached the conclusion that it's a rule, I think I may have The definition of rule in the APA is enormously broad. Right. I mean, this Court's case law, it seems like it has struggled with trying to identify the factors necessary to conclude whether something's a legislative rule or not. And I think there are two opinions that I think are very useful. One is from last summer, the National Mining Association case that Judge Kavanaugh wrote. And he identified the overriding concern in both the final agency action inquiry and the legislative rule inquiry is whether the challenge document has effects on regulated entities, legal effects, not practical effects. This methodology may, as a practical matter, affect future planning of timber sales, but that has to be left to a site-specific challenge in a future case. It's a practical effect. As I understand it, I mean, I asked you a while ago that you used this AL methodology to come to a hard number on the sustained yield sale, right? No. If I said that, I was incorrect. The sustained yield number was declared in 1995 and then adjusted in 1999. The methodology wasn't developed until 2007. What are you using it for now? So the AL methodology is not used to calculate the sustained yield figure. It was not in existence then. There's another planning revision process that's underway, and it's yet to be seen how they will arrive at the figure that they proposed there. So the figure, the $45 million, $57 million figure is what? No longer valid? It hasn't. The agencies have not been able to meet that figure for some time now. And as the record demonstrates, it's largely as a result of court injunctions. Can I ask, maybe I've got the procedure wrong here, too, but as I understood it in 1995 or thereabouts, you made predictions into the future about what the average annual sustainable yield sales would be, right? Now, in any given year, you have to make a decision about which trees you're going to cut, right? Yeah. In order to meet that or for any other reason, right? And every time you do that, that is a major federal action, correct? The individual timber sales. Yeah. Yeah. Right. And whenever you do that, you have to do a NEPA evaluation, and you have to evaluate under the Endangered Species Act, correct? Correct. Okay. And the Endangered Species Act says that each federal agency shall ensure that any authorized funded action is not likely to jeopardize the continued existence of any endangered or threatened species. And in fulfilling this requirement, each agency shall use the best scientific and commercial data available, correct? That's correct. And the OWL methodology is a bunch of staff scientists' view of what the best scientific and commercial data available is. Will likely be in any given case. That's right. Yeah. So in 1995, you make a bunch of predictions about what you can do, but when it actually comes time to cut stuff, you have to evaluate it under ESA and NEPA, and the way in which some staff biologists are recommending that people do it is to use the OWL methodology. Is that right? That is correct. Okay. That is absolutely correct. Further questions from the bench? Thank you. Thank you. Well, first let me, I'm Mark Rutzig representing the appellees. First let me try to answer some of the questions that the panel previously asked. Mr. Rutzig, can I ask you, here's the thing that fundamentally is an issue for me. The court orders, I'm reading from the court's order, defendant Salazar and his successors to sell or offer for sale the declared annual yield capacity in the Medford and Roseburg districts for each year, period. That's what he ordered, right? Now, he orders that, and there's no provision made for whether that violates the Endangered Species Act or whether it violates NEPA to do that, right? Yes. He makes no provision for that. No. So is that an order to the secretary that they are to violate, that they cannot fulfill their responsibilities under NEPA or ESA? They have to sell that amount in a particular year. It is an interpretation that the ONC Act mandates the selling of the declared annual sustained yield level. Yes. Regardless of the ESA or NEPA. That is a question that is unanswered and pretty much unasked up to this point, whether there is an unalterable conflict between the ONC Act and other environmental statutes. Well, those statutes come later, right? The ONC Act is earlier. It can't be that the secretary, that an earlier statute can order the secretary to violate a later statute. Isn't that right? No, but it can be, this is kind of off the point, but it can be that a later general statute does not amend or repeal an earlier specific statute. Well, this is a pretty specific statute. The ESA says that anybody who takes an endangered species goes to jail, right? It's a crime, right? Unless there are various exceptions, including an incidental take permit, etc. And if the Forest Service doesn't offer one, anybody who cuts down those trees goes to jail. Now, that seems like a very specific requirement. Likewise, NEPA says you can't undergo a major federal action without going into a detailed evaluation of the environmental impact. Correct? It's not true. Well, not exactly, because that's true for major federal actions. In general, the federal agencies do not consider individual timber sales to be a major federal action, so they do an environmental assessment rather than environmental impact. All right, but they still have to, I'll leave out the specifics of this, but that's right, they have to do an environmental assessment. That's very specific also. So you have a series of subsequent rules of statutes. That seemed to me completely inconsistent with the district court's order. And after all, what you are asking for is an order to compel agency action unlawfully withheld, right? Yes. And can it be unlawful to withhold action where if you take the action, that itself would be unlawful? It's not really what the court's ordering here, that the agencies take an unlawful action, that is they enforce one statute in violation of two subsequent statutes. The answer unequivocally is no. Tell me why. That's what's bothering me. The reason is that the Bureau of Land Management has never claimed and cannot claim that they are incapable of finding enough acres of trees to offer up 57.1 million board feet on the Medford district and 45 million board feet on the Roseburg district. They don't try. Well, there's no evidence that we have in the record one way or the other about that. Yes, there is. That they don't try? Well, yes, there is, because what the record shows is that the Bureau of Land Management sets a nonbinding target, but nonetheless a target. And every year over the period that we have looked at from 2004 to 2013, every year without exception, the target has been well below the annual sustained yield level. They haven't tried. Right, but they allege in declarations and in the various of their papers that there have been 10 years' worth of injunctions by district courts, and they allege that they need to do these environmental assessments, and whether they use all methodology or something else, they have to do a study. They allege all those things. All right. Well, first of all, there are no declarations submitted from the government, so we have arguments. Well, there's Mr. Perez's declaration. Mr. Perez's declaration after the fact. Right. But here's what they didn't say, and this responds to Judge Randolph's question. The injunctions are actually irrelevant to the issue here because when the BLM sells a timber sale, they count it even if it gets enjoined. And if they simply offer a sale and it gets enjoined, they count it as offered. So injunctions have nothing to do with meeting the level set in the ONCA. I didn't see that. I must have missed that. Where is that point made? Well, it's in the record. I can find it in the record. Yeah, if you would. I appreciate it. But before they can offer, even before they can offer, they have to do an environmental assessment, and they have to make sure they're not violating the Endangered Species Act. Absolutely. And that's one of the flaws of the owl methodology. The reason we challenged it in the first place is that they're not. . . It's one thing to say you protect owls. That's fine. We're fine with that. They're protecting random sites on the landscape that don't have owls. That's a secondary question. My first question is they still have to do an assessment, right? Well, we're not challenging that they have to do an assessment. Well, then how long does that take? You know, a consultation is supposed to take 135 days. So the district courts ordered this to be done in every year, and if in one sale you have to spend 135 days doing a consultation, it seems hard to imagine that his injunction is going to be able to be complied with without violating at least that responsibility, let alone what the responsibility would be if they found something at the end of the assessment. The BLM has never said that they are unable to meet the sale level if they truck. What they've said is they don't truck. They haven't said they don't try, and Perez's declaration says they have, that this is the problem, and the briefs are littered with this argument. Now, maybe there's fact-finding to be made as to what the real reason is that they haven't done it, but it seems to me we have a big problem here. You have an order from a district judge which provides no exceptions and which seems like on its face it requires the agency to plow forward regardless of other legal requirements. I'm not really following why that isn't the case. Well, that would have been an interesting point if they had raised it in the district court, but they never raised it in the district court. They never said we can't do this. Your order is so strict that we can't comply with it. They never said that, and Mr. Perez definitely did not say that. He said the same stuff about injunctions, and I have explained that injunctions have nothing to do with this because the BLM counts in joint sales and consultation. Yes, they have to do consultation, so maybe they have to do more consultations. That's exactly what they ought to be doing. They ought to be doing enough consultation so that they can reach the mandated sale level, and they've never said that there aren't enough trees available or that the ESA makes it impossible. They have never said that, or that NEPA doesn't make anything impossible because it's a disclosure statute, but they've never said that it's impossible. The argument about NEPA is the length of time it takes to do it. So regardless of what happened in the past, this is a prospective injunction, right? He didn't give you the shortfall. Yes, it is. That's correct. So that means within the next year they have to sell a certain amount. Perez says, for example, that the Spotted Owls survey that's going to be necessary now could take two years. So how are they going to sell within one year the amount the judges ordered them to do if the survey takes two years? Well, there's no Spotted Owls survey. They don't do surveys for Spotted Owls. It says, without reliance on the OEM, the time required to finalize biological assessments may take even longer if the BLAM determines it's necessary and appropriate to complete two-year Northern Spotted Owls surveys for new timber sales. Well, yeah, but they've not done that. We've had two years of no OEM. They don't do surveys. That's just not what they do. His statement was a correct if, but they don't do that. Well, he says the process to design and propose a forest management action and then conduct appropriate NEPA analysis for the action and ultimately issue a decision for implementation can take several years. I've heard them say that. And if they wanted to come back into court and say we need two years to get our system up and running so that we are working ahead so that we can meet the level, if they came in and said that, we would say fine. But that's for any individual. But they haven't. That's for any individual set of sales, not for in perpetuity. The judge has ordered this in perpetuity. Yes, that's right, because the statute requires it in perpetuity. And perpetuity is what sustained yield management is all about, that you get the same level year after year after year. So what if it were the case that you needed to do this every year? For every year, it's going to take longer than one year to get this done. Yes. Then what would be the situation then? You have to go back to the district judge. They have to start before the beginning of the fiscal year, which is what they used to do back in the 1980s when the BLM sold 1.1 billion bore feet of timber sales. They had a pipeline of sales that were in preparation, and each year they finished enough of them to sell 1.1 billion. Today their target statewide is 200 million, one-fifth of what it used to be. They don't have a pipeline. You'd have to ask them why they don't have a pipeline. There is no legal impediment to their having a pipeline so that they have the sales ready to go at the beginning of the fiscal year. Whether they should have had a pipeline or not, apparently they don't have a pipeline. The order applies within, was it 70 days of his order or something like that? Yes. Without any pipeline. Under what you just told me, there's no pipeline. So the order takes place within 70 days, and that's it, pipeline or not. Well, if they had a problem with that, they could have gone back to the district judge. They didn't have a problem with that. Well, I'll ask them whether they have a problem with that. Okay. What happens in the place of the OEM? He vacated the OEM, right? Right. The OEM is vacated. What comes in place? They do individual reviews based on information they have on actual owls. They don't have constraints on unoccupied owl territories or areas that are not owl territories. Can they substitute actual surveys rather than? No one does surveys. There are no spotted owl surveys done by any federal agency. Was there anything that stops them from doing it? In other words, if they can't use a computer model, is there any reason why instead they couldn't do a survey? The reason is they think it's too expensive. And that's why they chose the model instead. But you've eliminated the opportunity, not you, but the judge has eliminated the opportunity to have that modeling. No. The model is not a model of actual owls. They don't know where the owls are. These are random spots. That's why it makes no sense. These are random spots on the landscape where they put a dot and then they draw a circle around the dot and they say you can't cut in there. How did they choose where to put the dot? The computer does it randomly. No one knows. Based on what? Based on the kind of trees that are out in the landscape. But there are millions of acres of trees that are actual or potential habitat for northern spotted owls. There's 9 million acres of critical habitat and more than that around. So there's lots of acres of trees and they just pick the computer. And it's not even, it's worse than that. Because every time they do it, every time they have a new project, they run the OEM map and they come up with a new set of points that are different from the last set of points. So in project 1, they have the dots here. I'm gesturing to my left. And in project 2, they have the dots here. I'm gesturing to my right. And they're not the same dots because they're all random spots that the computer picks. And they run the computer every time and get a different answer. Before your time runs out, I want to switch gears here a little bit. How do we know that anything that you just talked about has any adverse effect on your clients? And take Swanson, for example. It was operating at three-quarters capacity due to market conditions, et cetera, et cetera. But how do we know that any of this has any effect on Swanson? The declaration from Mr. Swanson details three forms of injury that they are threatened with and have experienced. One of them he was very specific about, and that is the shortfall of BLM timber sales in western Oregon has caused log prices in western Oregon to be higher than in other areas where their competitors are located, which shrinks their profit margin. That's the post-judgment declaration, right? That from Mr. Swanson? The one you're reading from? Yes, I believe it is. But the declaration on JA-167 and 168 doesn't say that. And it also says that Swanson's operation gets timber from BLM land, from Forest Service land, from private land, from local landowners, and from the state. Yes. So my question is, if there's a shortfall and they're not operating at capacity, how do we know that the cause of that shortfall and the reason they're not operating at capacity is attributable to BLM as opposed to – and if it were, why couldn't they make it up with Forest Service land, with timber supplied by other state, local, and private timber landowners? Well, the real answer is they buy everything that's available and there's still not enough. The Forest Service is not – Do you know how many board feet are harvested each year in Oregon? Yeah, your figure was correct. It's about 3 billion board feet a year. Right. Yes, right. And that's not enough to satisfy a company that's operating with 160 million? No, sir, because Swanson is a company that does not own any timber land and they are dependent on sellers. And the companies that own timber land keep it for themselves or else they choose to export it, which some companies do. And there is not an excess of timber. I wouldn't be here if there were. The entire state of Oregon was in a timber depression. Isn't that correct? For a period of – for most of the – from 2004 to 2010? No, not from 2004. Starting in 2008, when the housing market crashed, the demand – That's when the depression started. Definitely, the demand dropped because housing starts dropping. And now they're selling to China? They're not selling – well, there's a little bit, but mostly they're selling to American home builders. The lumber market has recovered substantially and they're selling more lumber at higher prices. When I come back to my question, you – I mean, you're persuasive, but I don't find any of that in Mr. Swanson's declaration. I don't find him saying that the BLM is the reason for the shortfall in his operation. Well – Where is that? We know that there is a shortfall of BLM timber sales, right? I mean, that's – that much – at least if you accept the merits of our position, that's the case. I mean, that's taking the allegations as true? That's – just for standing purposes, that's assuming that we win on the merits. That's all. No, but this is a summary judgment, right? Yeah, right. And these are declarations and these are unchallenged declarations. Well, except – There's nothing in the record to contest them. In this court, yeah. Are they sufficient is the question. Pardon me? Are they sufficient is the question. Right. I understand that's the question. And so, Mr. – we – what – the other evidence we have when we talk about threat of mill closure is that one of the plaintiffs in this case, the Rough and Ready Lumber Company, did in fact have to close its doors and stop operations for over a year while this case was pending. So turn to that declaration. Okay. All right. And what the government says is the paragraph three assertion about the choo-choo sale. Yes. That since in the district court you didn't rely on that, you can't rely on it now. Well, that's not – In other words, isn't that the Rough and Ready's strongest point, that they – That the BLM took away the choo-choo timber sale. Yeah. That's correct. We did not rely on it. They took it away, and the company decided they were not going to file a court challenge to challenge the decision to take it away. But the BLM took it away, and it was 15 million board feet, which is half a year's supply for the Rough and Ready Lumber Company. So – And it went out of business for over a year. Wait. Where does it say that? Well, that is in Mr. Parton's declaration. I know, but it's not in the declarations that we're considering. Well, no. That is one of the declarations that – That was put in after. Well, it was put in in the context of the relief that we requested. The additional relief. Yes. That's correct. But it's in the record. And, I mean, it didn't happen until June – April of 2013. So it couldn't be in the record until it happened. What didn't happen? The closure of Rough and Ready. So then I couldn't establish standing because it has to be at the time of the complaint. Well, the point is not that this establishes standing. The point is that it shows that the threat of mill closure is an actual and imminent threat that is a sufficient actual and imminent injury to support Article III standing. That's the relevance of the Rough and Ready story. When did they close the mill? What year was that? They closed the mill in 2013. In April of 2013, they announced the closure. And I can just tell you that they were able to reopen the mill at a smaller, lower level in July of 2014. It's a pretty small mill to begin with. It's a very small mill to begin with. And they're about half of where they were. And that's all they can do. And they're hoping they can get enough timber. All I'm getting at is that normally in this circuit, we are fiercely strict about declarations, unlike in some of our sister circuits. And consequently, these very general statements may not be sufficient. That's the government's argument. Well, that's the government's argument. And I come back to this court's decision in the Mountain States Legal Foundation where they found standing in identical circumstances, absolutely identical circumstances. Lumber companies dependent on federal timber, they didn't prove which sales they didn't get to buy. They said they were threatened with closure. They lost profits, et cetera. And the court said that is fine for Article III standing and the environmental injury. But here's what Rough and Ready says in the affidavit that's relevant. It says, without an adequate supply of BLM timber and Forest Service timber, Rough and Ready may not be able to continue to operate its facility. But Judge Randolph's question raises the point about other sources. Well, I mean, look, the reality is that the Forest Service sells timber and the BLM sells timber. If this all adds up to we can't sue either of them because the other might in theory supply timber when in fact they don't. No, it's not theory here. It's a no-win situation. No, I understand that, but it's not theoretical. Well, it is theoretical. Why? Because the government does not claim that the Forest Service is able to make up the difference. No, no. I'm talking about private sources, et cetera. And the government does not claim that private sources are in fact available. There's no proof. No, but it's your burden. Well, there is proof. All right. The affidavit says that. The affidavit that Judge Rogers is talking about says that the company may also purchase lots from private sellers on the open market. Well, when they can, but not enough to meet their needs. It doesn't say that. That's the problem. What I'm getting at is I'm not questioning whether this is true or not. It's just a question of whether the declaration provides us with that information. Well, I have to go back to Mountain States Legal Foundation. I cannot see any distinction between the allegations and the facts in this case and those that were described by the court. I guess I'd have to go back and look at the declarations in that case to see what the court was relying on. I can get them for you and submit them if that would be helpful. If you're happy to. Do you agree that the declaration says that they've been using about 25 million horse feet of timber per year? It says rough and ready. Rough and ready, right. And they rely on DLN timber. They say that. What percentage of that 25 million has traditionally, for rough and ready, been DLN timber? Well, given that the declaration doesn't say it, I can tell you what the answer is. The declaration doesn't tell me. For all I know, reading this declaration, the DLN timber represents 1% of their operation. We know that's not true because the Choo Choo timber sale, which the BLM took away, was 15 million board feet. That is over 50% of one year's supply for rough and ready. So we know that it's not anything like 1%. So in Mountain States, the court says, citing the declaration of the owner of the company, that the company mill was temporarily closed and 25 workers were laid off as a result. So, I mean, that's very specific information. We don't have that here. That's all I'm getting at. Well, we don't. We have the threat of that. We have the actual and imminent threat of that. It's really a threat if they couldn't get the lumber from other sources. Well, yeah, that's by definition true, but there is no— Was there a reason why they couldn't get the lumber from another source? Yes, because it's not available. Why not? Because the demand for timber is far greater than the supply of timber, and that's why you see that on BLM timber sales, the price that they sell for is sometimes three or four times what the market price is that the BLM says the sale is worth. See, that's what I'm getting at is that all may be true, but it's just not in the affidavit. Well, the affidavits do not contain that specific information. I agree with that. The fact that BLM timber goes for a higher price than timber from private landowners may be attributable to the fact that the BLM timber is old growth, and it's much more economical and efficient to deal with old growth timber than it is from younger growth. Well, in theory, that definitely is one explanation for a difference in price. Your response to my question, this choo-choo thing, which would have represented 50% of Rough and Ready's supply and it fell through, I don't understand how that tells me what percentage or even gives me any idea of what percentage traditionally over the years Rough and Ready has or uses BLM timber. One year they bid on it and it was a high bidder and that would have taken 50% of their capacity, but that doesn't tell me anything about any other year. Well, that one year is sufficient for Article III injury. They bid on the sale. They were the high bidder on the choo-choo sale in 2006. You're not challenging them. No, that's right, but we're challenging the general shortfall of BLM timber sales and the lack of the choo-choo sale, which, by the way, they counted as part of their successful program in 2006, even though they took it away from the company in 2012. But Rough and Ready was waiting six years for that sale and then the BLM took it away from them. What was the reason they took it away? Because they found some red tree voles and there is a protocol for protecting red tree voles. So is the cause of the injury the requirement to protect red tree voles rather than a failure otherwise to follow the ONC Act? No, the failure is the BLM's failure to offer the full level of sales every year. This particular sale, I mean, the facts of this sale, and the red tree vole, by the way, is not a threatened or endangered species. It's just they have a protocol that they have to do something for red tree voles, and they went back and they looked and said, oh, we've got a lot of red tree voles, so we're going to take the sale away from you. Okay. Further questions? I had one question, really, just by way of background. If the BLM sells and loggers go into areas where they're permitted to harvest the trees, and they see whatever it is, a spruce or something, and on top of that tree is a spotted owl nest, can they cut it down? No. No, they flee as rapidly as possible. They report it to the BLM and no one goes anywhere near a spotted owl. There's no evidence that a spotted owl has ever been killed by a logger. Okay. They don't have permission to just clear cut. No, absolutely not. Thank you. Any time left? We'll give you two more minutes. Regarding standing, it's not our contention that the plaintiffs couldn't ever prove standing. It's simply that the affidavits they submitted prior to the court's summary judgment order were insufficient proof under the standards in Lujan against Defenders of Wildlife because they lacked the specificity. Had they brought a different suit? And the other affidavits filed after judgment were too late? Correct. After Summers, it's different. We have a doctrine in this court that if there's doubt about standing, you can file affidavits in the Court of Appeals, and if you can do that, why can't they file them after judgment? Every one of them is after judgment, judgment of agencies. I believe, Your Honor, after Summers, that that's no longer allowed in the normal cases that come up through the district courts, to the Courts of Appeals. The distinction is between direct review and review on appeal. Exactly. Because the agency doesn't have a Article III requirement, so there's no reason to have it in the agency. Precisely. While the district court does. That's correct. Lujan wasn't direct review, was it? Or was it? I do not believe it was. No, I believe it was an APA. It was an Endangered Species Act. Right. I know that. So it was brought in a district court. There wasn't a petition for review in the Court of Appeals. And neither was Summers, which establishes that the declaration is true. No, I know Summers. Could I just ask one question? I'm sorry. You were talking about the Department counts trees that were offered in the past and then still had to undergo these environmental reviews. Now, is part of why the situation either is or is not true because of the government's position about what is a normal market and what that means? It's part of it. I mean, I think to try and clear up some of the confusion, they do, when they award the sale, they count it toward the annual figure. Right. If it's enjoined subsequently, they don't then take it away. It was awarded, considered sold during that year. Right. The problem comes when injunctions and remand orders require the agency to spend its time and resources redoing sales it already prepared. And the evidence in the record is that it takes three to five years, typically, to prepare a sale, to get it in the pipeline, if you will, as my friend put it. So the time that's spent, and some of these judicial opinions from the Ninth Circuit invalidate programmatic documents that affect dozens and dozens of timber sales, not just the ones that are directly challenged in the case. So then the agency has to take time and go back and look at other sales that are not in litigation then to see whether they are compliant with the new intervening law. That additional time prevents the agency from preparing new timber sales to get in the pipeline. And so one of the arguments that the agency had made was this owl methodology was a way to try to get these trees on the market faster, since the agency didn't have the manpower to do the surveys, et cetera. That's right. I mean, it was in response to a court order that halted dozens of timber sales, and it was a way to fix that administratively by providing a rational method for calculating estimated incidental take. This is the Oregon Natural Resources case? Yes. So this is another thing that's puzzled me. If the owl methodology is vacated, I thought the point about Oregon Natural Resources was an instruction that you can't go forward unless you come up with a numerical method of counting. And so in the absence of the owl methodology, doesn't the Ninth Circuit's opinion stand and you can't do anything? You can't issue incidental take permits anymore. So I don't think it's that categorical, but, yes, the decision still stands, and the agency still has to figure out a way to estimate numeric take or alternatively explain why that's not possible to do in a given situation. So even with the methodology enjoined, the agency still has to use the best available science, some of which is cited in the methodology paper. It refers to other scientific papers. The principles in those scientific papers can still be used by local biologists to estimate effects to the owls. So if you could just clear up for me, the opposing counsel said that you didn't make below the argument that you had sort of between a rock and a hard place here, that there were injunctions from the Ninth Circuit, and I take it from district judges in the Ninth Circuit, that there was the requirements of the ESA, that there were requirements of NEPA, all of which had to do with the timing, among other things, but also substantive requirements under the ESA and obviously obligatory requirements under injunctions, and that those were responsible, at least in some significant material part, for the reason that the agency can't do the annual sustainable yield. Am I misunderstanding? No. I mean, we made that argument. It's on our yellow brief, pages 21 to 22. We have the joint appendix sites to the briefs below where we made those arguments and preserved them. The argument we didn't make, and it's really, I mean, the position we didn't take was that somehow it's impossible, as a factual matter, to comply with the Lands Act and Endangered Species Act. I thought that you had, after, in your summary judgment opposition, you said that if the court grants summary judgment, you want an opportunity to explain the problems of the ESA with respect to the remedy. With respect to the remedy. Well, the remedy being an injunction that orders you to do something without exception, and the district court did not permit that. That's correct. So we made that argument as a matter of remedy and a matter of, as an equitable matter. And we would have shown that it wouldn't be appropriate for the court to issue a broad, sweeping, mandamus-type order in this situation because of the uncertainty of litigation and whether sales that they prepare will actually go forward and be able to be awarded. And if not, whether the efforts to redo those sales would consume so many resources that they wouldn't be able to prepare other sales. So that information is largely in the record, and we do refer to it in making our merits argument here on appeal as well.  from being able to sell or offer to sale, and each year Daniel sustained the yield. So one of the main things has been something called the survey and manage measures, which are part of the forest planning regime in this area and part of the land use plans. And they require the – Could you repeat that? The survey what? Survey and manage. It was part of the land use plans, and there was an administrative attempt to remove it because it was consuming a lot of time and agency resources for each sale. The person in this – the foresters had to go out and survey timber sale sites to see if critters like the red tree vole were actually present or nest trees for these animals were actually present in the timber sale units. That was the result of some interpretations by the courts. They couldn't just survey for the habitat. They had to actually go out and be on the ground and looking for this. That took a lot of time and a lot of money and prevented a lot of sales from going forward in the areas where there would be larger volume. It's called these regeneration sales where it's five acres, say, of a cut that's more than just thinning, leaving some trees per acre but not many. Those generate larger volume, but they also generate more public controversy and more lawsuits. Some of those areas where that type of harvest could be conducted were right – people were finding red tree voles all over the place, and so that was adding additional time and resources and costs to preparing those sales. That's a big factor, and the attempts to remove that measure in the Northwest Forest Alliance against Ray case from Western District of Washington we cite in our briefs, we attempted – the Interior Department attempted to remove that administratively, and the decision was set aside as arbitrary. By the district court? Correct. Correct. Thank you both for excellent arguments. We appreciate it. We'll take the matter under submission.
judges: Garland, Rogers, Randolph